# IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL CASE NO. 15-00065 |
| Plaintiff, | |
| vs. | **DECISION & ORDER RE DEFENDANT'S MOTION TO SUPPRESS** |
| JOHN PAUL TALAVERA MARQUEZ, | |
| Defendant. | |

Defendant John Paul Talavera Marquez ("the Defendant")'s Motion to Suppress (ECF No. 12) came before this court for an evidentiary hearing that began on March 23, 2016, and was continued to May 3 and 9, 2016. After reviewing the parties' submissions, and relevant caselaw and authority, and having heard the testimony of witnesses and argument from counsel on the matter, the court took the matter under advisement. For the reasons more fully discussed herein, the court hereby **DENIES** the Defendant's Motion to Suppress.

## I.  CASE OVERVIEW

### A.  Procedural Background.

On December 7, 2015, the United States filed a Complaint against the Defendant, alleging that he knowingly and intentionally imported approximately 47.3 grams of a substance with a detectable amount of methamphetamine. *See* Compl., ECF No. 1. On December 16, 2015, an Indictment was returned by a Grand Jury charging the Defendant with Count 1: Possession

with Intent to Distribute Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(C); Count 2: Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(A)(1)(i); Count 3: Importation of Methamphetamine, in violation of 21 U.S.C. § 952(a) & 960(b)(2)(H); Count 4: Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1). *See* Indictment, ECF No. 6.

On February 29, 2016, the Defendant filed the instant Motion to Suppress. ECF No. 12. On March 2, 2016, the Grand Jury returned a Superseding Indictment, adding three more counts, Counts 5, 6, & 7: Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1). *See* Superseding Indictment, ECF No. 14.

## B. Factual Findings.

Agent Robert Ramirez ("Agent Ramirez"), Department of Homeland Security, Homeland Security Investigations; and Task Force Officer Yvonne Cruz ("Officer Cruz"), Bureau of Alcohol, Tobacco, Firearms & Explosives, testified for the United States during the evidentiary hearing. The United States submitted thirteen exhibits, which were admitted at the hearing. The Defendant called Officer Jeremy Artero ("Officer Artero"), Guam Customs and Quarantine; Juanito Marquez, uncle of the Defendant; and Samantha Marquez, cousin of the Defendant. The Defendant submitted five exhibits, which were also admitted at the hearing.

Agent Ramirez testified that on October 2015, a cooperating defendant from another case ("confidential informant" or "CI") informed agents with the Department of Homeland Security, Homeland Security Investigations ("HSI") that the Defendant would smuggle methamphetamine from the Philippines into Guam through A. B. Won Pat International Airport by concealing the drug in his rectal cavity. HSI agents relayed this information to Guam Customs and Quarantine ("GCQ") which issued a "lookout" to its field agents for the Defendant.

On November 8, 2015, the Defendant arrived into the A. B. Won Pat International

2

Airport from the Philippines. The Defendant was referred for a secondary inspection and strip search, which returned negative results for contraband. However, the Defendant was interviewed and confirmed that he and the CI were friends, and that the CI had stayed with the Defendant when the CI was previously on parole. The Defendant also had stamps in his passport indicating frequent trips to the Philippines. When asked how he funded these trips, the Defendant stated it was from proceeds from selling items at flea markets and from airline miles.

On November 13, 2015, the CI met with the Defendant at the Defendant's residence. The CI was equipped with covert electronic audio and video recording and monitoring devices. The equipment permitted law enforcement to monitor the audio feed in real time while they stayed unrevealed within a couple of blocks of the residence.

At the meeting at the Defendant's residence, the CI, the Defendant, and a third person named "Joe" had a conversation. During the conversation, the Defendant recounted how he had been searched for drugs by GCQ and HSI agents the last time he returned to Guam, and although he was nervous during the search that someone may have reported him, he stated that the agents did not know anything about his smuggling activities. The Defendant also mentioned that he had just sent money to someone in the Philippines and would be traveling to the Philippines within a day or two.

As the conversation unfolded, the Defendant and "Joe" negotiated a drug deal via text message with another person not present at the meeting, wherein the Defendant can be heard quoting a price of $450 for a gram of methamphetamine. The Defendant stated that the $450 would allow him to have money for "P.I."[1] The conversation also turned to a discussion about a silver firearm, which the Defendant claimed ownership of, and is visible in the video recording, within reach of the Defendant. Shortly before concluding the meeting, the Defendant also

---

[1] The evidence did not elaborate on the meaning of "P.I." as used by the Defendant at that time, but it is a term commonly used to refer to the Philippines or Philippine Islands.

provided 0.1–0.2 grams of suspected methamphetamine to the CI. HSI Agents advised GCQ about the November 13 meeting and the possibility that the Defendant could be smuggling drugs into Guam via his anal cavity.

On Sunday, December 6, 2015, at 7:07 a.m., the Defendant flew into the A. B. Won Pat International Airport from the Philippines, accompanied by a friend with the initials, "J.L." Officer Artero testified that he and Drug Detector Dog "Kay" canvassed the passengers from the Philippines flight in the Customs and Quarantine passenger processing area where passengers gather their luggage from the carousel. He testified that he was told that a male passenger from that flight might be smuggling drugs, but did not know any other details, including whether the drugs would be in the passenger's luggage or on his person.

During the canvassing, "Kay" alerted only to the Defendant. Officer Artero testified that this was the fourth time that he had worked with Kay, and the first time that "Kay" had alerted to a passenger with Officer Artero. Officer Artero testified that specifically, "Kay" came across the Defendant and indicated that she smelled drugs with a "stand and stare." Based on Officer Artero's training, he then proceeded to direct "Kay" to sniff specific areas of the Defendant's baggage and person by waiving his hand past those areas and waiting for her to sniff, a process called "detailing." When he "detailed" the Defendant's groin and rear area, "Kay" sniffed the area and then nodded her head quickly and stared ahead, which is an "alert" indicating that she detected drugs in the area detailed by the handler.

After "Kay" alerted to the Defendant, Officer Artero did nothing to detain the Defendant, who gathered his luggage and proceeded to the primary inspection counter. Sometime between 7:30 and 8:00 a.m., he presented his passport and customs declaration form. He did not declare that he was traveling with controlled substances. He was then sent to secondary inspection, where a search of his bag and belongings, and a strip search of his person, did not reveal any

4

substances. The Defendant was asked whether he was transporting controlled substances, and he denied having any.

GCQ Officers then asked the Defendant if he would be willing to answer further questions. At approximately 9:10 a.m., he agreed to do so. HSI agents advised the Defendant of his *Miranda* rights, using ICE Form 73-025. The Defendant acknowledged his rights both verbally and in writing, initialing and signing ICE Form 73-025. Gov't Ex. 1.[2] During the subsequent interview, the Defendant admitted to smoking methamphetamine in the Philippines with J.L. two days previously, and on other occasions, including with the CI. HSI agents asked him if he was currently smuggling methamphetamine internally, and he denied doing so. HSI agents then asked the Defendant to do an x-ray examination, and he verbally consented, but retracted his verbal consent and requested to speak with an attorney when presented with the consent form. HSI agents terminated the interview at that time, which was approximately 11:30 a.m.

HSI agents also interviewed J.L., the Defendant's friend and co-traveler. J.L. stated that the Defendant was currently smuggling "ice"-filled balloons back to Guam inside his rectum. J.L. also stated that while he and the Defendant were in the Manila airport waiting to fly to Guam, the Defendant expelled the drugs and reinserted them when it was time to board the flight.

Federal agents then contacted the U.S. Attorney's Office to obtain two search warrants. HSI sought a search warrant for the Defendant's person, to include an x-ray examination of his torso and abdominal areas. *See* Application, ECF No. 1, MJ Case No. 15-00120. In the event that the x-ray revealed any foreign matter, the search warrant sought removal of the foreign matter by means of a laxative, and if that failed, other medically safe procedures. *Id.* at 5. The Bureau of

---

[2] All exhibit numbers are in reference to the exhibits presented at the hearing.

Alcohol, Tobacco, Firearms & Explosives ("ATF") sought a search warrant for the Defendant's residence, seeking evidence relating to firearms. *See* Application, ECF No. 1, MJ Case No. 15-00121. The Defendant's residence is described in the Application as the "renovated garage" of the residence located at 162 Quezon Street, NCS (Dededo). *Id.* at 4–5.

The Defendant was transported first to the HSI office next to the A. B. Won Pat International Airport, and at approximately 3:00 p.m., he was taken to Guam Memorial Hospital for observation. Dr. Johnny Kim, who was responsible for the Defendant's medical care,[3] was informed that the Defendant may be concealing illegal narcotics internally, and that agents were waiting on a search warrant before proceeding with an x-ray examination. Dr. Kim said something to the effect of "this is my hospital," and asked the Defendant to do the x-ray examination anyway, despite agents telling him about the impending search warrant. The agents told the Defendant that he did not need to undergo any x-ray examination until they got the search warrant, but the Defendant orally consented to an x-ray examination at that time. The agents did not get a signed consent form.

The x-ray examination revealed the presence of multiple unknown foreign objects inside the Defendant's body. Dr. Kim then recommended a CT scan for better clarity, to which the Defendant also consented.

Before a CT scan could be completed, the Defendant stated that he did not want to die and "they've been inside me too long," and requested to use the bathroom. Agents escorted the Defendant to the bathroom, sealing the toilet with a plastic bag and container in order to recover any suspected contraband. The Defendant stated that he had "four inside him." Between approximately 7:40 p.m. and 8:06 p.m., the Defendant proceeded to defecate, and expelled three big balloons and a fourth, small balloon. A field test of the substance found inside one of the

---

[3] Agent Ramirez also stated that a Dr. Seung Hu Li also attended to the Defendant, but that his involvement was limited to giving the Defendant an initial checkup.

balloons returned a presumptive positive result for methamphetamine. After retrieving the balloons, agents checked to make sure they weren't punctured, and placed the Defendant under arrest. He then underwent a CT scan, and when the scan was negative for any more foreign objects, he was transported back to the HSI office.

Meanwhile, at 8:01 p.m. and 8:03 p.m., respectively, the magistrate judge authorized both warrants. *See* Warrant Return, ECF No. 2, MJ Case No. 15-00120; Warrant Return, ECF No. 2, MJ Case No. 15-00121. At 8:35 p.m., ATF agents began executing the search warrant for the Defendant's residence. Agents recovered a black pouch containing a silver Browning Arms & Company, 9mm pistol—the same color and size as the firearm depicted in the November 13, 2015, undercover video recording— along with eight rounds of ammunition, an empty magazine, and drug paraphernalia. Warrant Return, ECF No. 2 at 3, MJ Case No. 15-00121; Gov't Exs. 6–7.

At approximately 10:05 p.m., the Defendant requested to speak with agents. HSI agents again advised the Defendant of his *Miranda* rights, using ICE Form 73-025. The Defendant acknowledged his rights both verbally and in writing, initialing and signing ICE Form 73-025. Gov't Ex. 2. Agent Ramirez saw the Defendant write, initial, and date the form, and also the following statement on the form: "I voluntarily asked to meet with HSI agents after requesting for an attorney." Around that time, the Defendant was informed that the ATF agents had obtained a search warrant for his residence, and he informed agents that he had a total of four guns under the bed in his residence.

The Defendant was then transported to the residence by HSI agents to assist them in finding the remaining weapons. The Defendant indicated that the additional firearms were located in his old bedroom in his parents' home. The Defendant's residence is a renovated garage that was converted into a bedroom, and is structurally attached to his parents' home, but is a

7

separate unit. Def. Ex. A-1. The doorway out of the Defendant's residence leads to an outdoor hallway, in which there is a door to an outdoor bathroom, and another door giving access to the main residence.

The court finds that the Defendant indicated to the agents that he had access and control over the home while his parents were out of the country and consented to a search (limited to his old bedroom) in writing, by initialing and signing ATF Form 3220.11. *See* Gov't Ex. 11. The court also finds that the agents and officers did not coerce the Defendant into signing the form. Agent Ramirez and Officer Cruz testified that no statements were made to the Defendant by any of the officers or agents threatening him into signing it, nor did any agents or officers have their guns drawn.

The ATF form contains a written statement ("I have access and control over my parent's residence who are currently out of the country, and I am the appointed caretaker. This consent is limited to my old bedroom to retrieve firearms that I placed there."). *Id.* The court finds that the Defendant did not write the statement, because Officer Cruz testified that another ATF Task Force Officer, Officer Edgar Tiamzon, wrote it. *Id.* However, the court finds that the Defendant understood the written statement and voluntarily consented to the search of his old bedroom when he signed next to the written information, as well as at the bottom of the form. Officer Cruz testified that she witnessed the Defendant acknowledge the statement and sign the form. No threats were made to the Defendant to make him sign the form, nor did any agent or officer have his or her gun drawn.

The agents had previously recovered two sets of keys from the Defendant's person, and only brought one set to the residence, which was the wrong set and lacked a key to the parents' home. *See* Gov't Ex. 4. While agents retrieved the correct set of keys at the HSI office, they asked the Defendant if there was another way to get into the residence.

8

The Defendant then stated that when he gets locked out of his parents' home, he uses a certain window to enter. Agent Ramirez then tried to open the window that the Defendant had indicated, which was unlocked. Agent Ramirez then opened the window, stepped through the window, turned back and got a nod from the Defendant, and then entered the home through the window.

Upon entering the room, Agent Ramirez proceeded to the front door, approximately ten feet from the window, unlocked the door, and let the Defendant and the agents into the house. The Defendant then led agents to his old bedroom and proceeded to tell the agents where they should search for remaining weapons. The agents found three firearms in the bedroom (a Llama, 45 caliber pistol; a Ruger, model MK II, 22 caliber pistol; and a Smith & Wesson .357 revolver) along with a large amount of ammunition (nine rounds of .357 ammunition; sixty-eight rounds of .22 ammunition; seventy-two rounds of 9mm ammunition; and fifty rounds of .45 ammunition). *See* Gov't. Ex. 10.

Non-law enforcement persons were present at the scene that night as well. Juanito Marquez and Samantha Marquez were both present at the scene. Juanito Marquez and Samantha Marquez live next door to the Defendant and his parents, and Juanito Marquez is the Defendant's father's brother. Samantha Marquez testified that she walked over to the officers and agents when she saw them standing outside her aunt and uncle's home (the Defendant's parents' home). She also testified that she spoke with a "large, non-local, non-Filipino officer," asking to see a warrant and that the officer refused to show it to her. She further testified that she told the officer to show her father (Juanito Marquez) the warrant, because he is in charge of the home while the Defendant's parents were off-island.

Juanito Marquez testified that he also walked over from his and Samantha Marquez's home and told a "large, Chamorro officer" that he was the caretaker of the Defendant's parents'

1 home while they were away in the Philippines. Juanito Marquez stated that he had keys to the

2 home and would pay utility bills and generally maintain the home while the Defendants' parents

3 were away. Juanito Marquez testified that he did not know if the Defendant had keys to access to

4 the home, but Samantha Marquez testified that the Defendant did not have keys.

5 Officer Cruz testified that Juanito Marquez and Samantha Marquez were present that

6 night and that Juanito Marquez spoke to Officer Tiamzon.

## II.     STANDARD OF REVIEW

8 In an evidentiary hearing on a motion to suppress, the Defendant has the burden of

9 persuasion, in establishing that his own Fourth Amendment rights were violated by the

10 challenged search or seizure. *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005). The

11 prosecution, as the proponent of the evidence, must bear the burden of proving its admissibility.

12 *See United States v. Coades*, 468 F.2d 1061, 1064 (3d Cir. 1972); *United States v. Colbert*, No.

13 89-310, 1990 WL 5200 at *1 (D.N.J. January 23, 1990) (citing *Katz v. United States*, 389 U.S.

14 347 (1967)).

15 On a motion to suppress, the controlling burden of proof imposes no greater burden than

16 proof by a preponderance of the evidence. *See United States v. Matlock*, 415 U.S. 164, 177 n.14

17 (1974).

## III.    DISCUSSION

19 The Defendant asserts that: A) the introduction of the hidden camera video should be

20 suppressed as violative of the Confrontation Clause; B) the dog sniff must be suppressed because

21 it lacks any indicia of reliability; C) evidence resulting from the search of the Defendant's person

22 must be suppressed because he was subject to non-routine searches and his consent to x-ray and

23 compulsion was ill-gotten; D) the search and evidence obtained from the Defendant's home must

24 be suppressed because it is fruit of the poisonous tree; and E) the search and evidence obtained

from the Defendant's parents' home must be suppressed because officers exceeded the scope of the search warrant, and the Defendant did not have the ability to consent to the search.

**A.      Undercover Video and Audio Recording of the November 13, 2015 Meeting.**

The Defendant moves to suppress the video evidence recorded on November 13, 2015. After recording the video, but before trial, the CI passed away. The Defendant contends that because the CI cannot testify during trial, any admittance of the video at trial would violate the Confrontation Clause.

The Confrontation Clause of the Sixth Amendment states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. CONST. AMEND. VI. The U.S. Supreme Court has determined that where the United States attempts to admit hearsay at trial against a defendant, and the hearsay is testimonial in nature, the Confrontation Clause demands both that that the witness be unavailable and a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 68 (2004).

In the present case, the CI's recorded statements are possibly testimonial, because the CI was aware that his statements could be used in trial. *See, e.g.*, *United States v. Larson*, 460 F.3d 1200, 1213 (9th Cir. 2006) *as adopted on reh'g by United States v. Larson*, 495 F.3d 1094, 1099 n.4 (9th Cir. 2007) (on banc). However, there would be no Confrontation Clause violation if the United States offers them for the purpose it claims it will offer them for: putting the Defendant's recorded statements into context. *See, e.g.*, *United States v. Eppolito*, 646 F. Supp. 2d 1239, 1240 (D. Nev. 2009). *Crawford* makes clear that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford*, 541 U.S. at 59 n. 9.

Although the Ninth Circuit has yet to publish an opinion on this issue, there are multiple post-*Crawford*, unpublished Ninth Circuit opinions that rule that the recorded statements of a

11

deceased confidential informant are not banned by the Confrontation Clause if they are used for the non-hearsay purpose of providing context for the defendant's recorded statements. *See, e.g.*, *United States v. Nguyen*, 230 F. App'x 686, 690 (9th Cir. 2007); *United States v. Moore*, 365 F. App'x 800, 802 (9th Cir. 2010).[4]

Accordingly, the court DENIES the Defendant's motion to suppress the undercover video at this time, but it will revisit the issue at trial if the United States tries to admit the statements for their truth.

**B.      Drug Detector dog "Kay" Sniff Alert Evidence.**

The Defendant next contends that the dog sniff alert from drug detector dog "Kay" should be suppressed because no evidence has been supplied as to Kay's reliability or training.

At a hearing on a dog's alert, if the government has produced proof from controlled settings that a dog performs reliably in detecting drugs, including training programs and formal certifications, the court should find probable cause. *Florida v. Harris*, 133 S. Ct. 1050, 1057–58 (2013). However, if the defendant has challenged the government's case (by disputing the reliability of the dog overall or of a particular alert), then the court should weigh the competing evidence. *Id.*

At the hearing on the Motion, the United States supplied certification records for both "Kay" and the dog's handler, Officer Artero. *See* Gov't Exs. 12–13. Officer Artero was trained in Florida in October 2015 by AMK9, a private company that certifies federal and local agencies in using dogs to detect drugs. *See* Gov't Ex. 13. "Kay" was certified and trained in Guam, using a different method, because GCQ apparently only recently began using AMK9. According to the

---

[4] Further, the First, Third, Seventh, and Eighth Circuits have all published opinions ruling that recorded statements of a deceased confidential informant are admissible for the purpose of providing context to a defendant's recorded statements. *See, e.g.*, *United States v. Walter*, 434 F.3d 30, 33–34 (1st Cir. 2006); *United States v. Hendricks*, 395 F.3d 173, 183–84 (3d Cir. 2005); *United States v. Tolliver*, 454 F.3d 660, 665 (7th Cir. 2006); *United States v. Spencer*, 592 F.3d 866, 879 (8th Cir. 2010). Accordingly, the court finds these cases instructive.

12

certification/training record supplied for "Kay," she completed the Guam Customs Canine Training Academy's Basic Canine Narcotic Detection Course, is trained to detect methamphetamine, and can detect its presence in people. *See* Gov't Ex. 12. Although they were not certified or trained together as a pair, Officer Artero testified that this is not required for a handler and a drug dog to produce reliable alerts together.

Further, Officer Artero testified in great detail as to his working relationship with "Kay." The morning of December 6, 2015 was the fourth time that they had worked together as a team. Further, Officer Artero testified that he and "Kay" began their shift around 1:00 a.m., examining passengers from two other flights before the Defendant's flight arrived. Officer Artero also explained how they came across the Defendant, knowing only that a male from that flight may be carrying drugs, but not knowing if the drugs were in the man's luggage or on his person. Finally, Officer Artero testified to the alert by "Kay" to the Defendant, which was her only alert that day, and which was directed at the Defendant's rear-groin area.

The Defendant argues that because "Kay" had not yet alerted in the field with Officer Artero before alerting to the Defendant, her alert is not reliable. However, this is immaterial: "Kay" had completed a training program, which is more reliable than field tests. *See, e.g.*, *Harris*, 133 S. Ct. at 1057 ("The better measure of a dog's reliability thus comes away from the field, in controlled testing environments."). Further, while the Defendant takes issue with "Kay's" ability to detect drugs in a rectal cavity, Officer Artero testified that the dog is able to detect drugs so long as the drugs are exposed to heat and moisture, which includes rectal cavities. The court finds that Officer Artero and "Kay" are both adequately trained and certified in drug detection methods, and that the alert from "Kay" is sufficiently supported by indicia of reliability.

For the foregoing reasons, the court **DENIES** the Defendant's motion to suppress the dog

13

sniff and alert.

**C.      The Defendant's Detention and the Non-routine Search of His Person.**

The Defendant asserts that he was unreasonably detained for thirteen hours, was subjected to non-routine searches, and coerced into consenting to an x-ray examination and "expelling drugs from his rectum."

The Fourth Amendment states that the "right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated . . . but upon probable cause[.]" U.S. CONST. AMEND. IV.

**1.      Reasonableness of border detention.**

The detention of a traveler suspected of "smuggling contraband in her alimentary canal," is considered a non-routine customs search and inspection, and requires "reasonable suspicion." *United States v. Montoya de Hernandez*, 473 U.S. 531, 541 (1985). "Reasonable suspicion" is defined as a "particularized and objective basis for suspecting the particular person of alimentary canal smuggling." *Id.* at 541–42.

In the present case, the facts known to the officers that led them to detain the Defendant meet the reasonable suspicion standard. At the time of the detention, the officers already had been advised by HSI agents about the November 13 meeting between the CI and the Defendant, and the possibility that the Defendant could be smuggling drugs into Guam via his anal cavity. Also, as discussed above, on December 6, drug detector dog "Kay" alerted to the Defendant when he disembarked from the airplane.

Further, the court finds that the actual length of time that the agents and officers detained the Defendant while seeking a search warrant (approximately from 7:30 or 8:00 a.m. when he was sent to GCQ secondary inspection until a little after 8:00 p.m. when he completed expelling the drug-filled balloons from his rectum) was reasonable. A detention at the border while an

14

order is sought to conduct a body search is reasonable if there is no evidence to suggest that the government did not move as expeditiously as possible. *United States v. Ek*, 676 F.2d 379, 382 (9th Cir. 1982) (upholding a ten-to-twelve-hour detention).

In *Montoya de Hernandez*, the Supreme Court upheld a sixteen-hour detention in which officials in the Los Angeles airport waited for a suspected alimentary canal smuggler from Bogota, Columbia to have a bowel movement to expel balloons filled with drugs. *Montoya de Hernandez*, 473 U.S. at 543–44. The *Montoya de Hernandez* defendant was detained after landing shortly after midnight, and after refusing to take an x-ray, "sat in the customs office, under observation, for the remainder of the night" and all the way until 4:00 p.m. the next afternoon before officers even sought a search warrant, which was not signed until just before midnight of that day. *Id.* at 535. In upholding the detention, the Supreme Court stated that the detention was "long, uncomfortable, indeed, humiliating; but both its length and its discomfort resulted solely from the method by which she chose to smuggle illicit drugs into this country" *Id.* at 544.

In the present case, the Defendant was detained between 7:30 and 8:00 a.m. The United States began to work to secure a warrant for an x-ray and body cavity search as soon as the Defendant withdrew his consent to x-ray, which was approximately around 11:30 a.m. At approximately 7:40 p.m., the Defendant requested to use the bathroom and expelled a total of four drug-filled balloons by 8:06 p.m. Although it ultimately was not required, a warrant to search the Defendant's person was signed by the magistrate judge at 8:01 p.m. the same day that the Defendant was detained, which was also a Sunday. *See* Warrant Return, ECF No. 2, MJ Case No. 15-00120.[5] Based on the circumstances discussed above, the court finds the length of

---

[5] At the hearing on the Motion, the court took judicial notice of its phone records (JN1) and noted that an internal phone call was first made to the magistrate judge at 5:55 p.m. on December 6, 2015, meaning that the court first

detention reasonable.[6]

## 2. Validity of the strip search.

Next, the court must determine if the strip search violated the Fourth Amendment. The Supreme Court has determined that "strip, body cavity, or involuntary x-ray searches" are non-routine searches and thus require a higher level of suspicion than mere reasonable suspicion. *Montoya de Hernandez*, 473 U.S. at 541 n.4. To conduct a strip search, authorities must have a "real suspicion" that the person is smuggling contraband. *Ek*, 676 F.2d at 382. Real suspicion is "subjective suspicion supported by objective, articulable facts." *Id.* (internal quotations omitted).

In the present case, the officers had enough information to have a real suspicion that the Defendant was smuggling contraband. In previous Ninth Circuit cases, the "clear indication" standard, which is used for x-ray and body cavity searches and is stricter than the real suspicion standard (*id.*) was "easily met" when a confidential informant named persons who would attempt to smuggle cocaine via balloon or capsule swallowing, and could also describe details about the smuggling scheme. *See, e.g.*, *id.*; *United States v. Couch*, 688 F.2d 599, 605 (9th Cir. 1982). Similarly, in the present case, the CI told authorities that the Defendant would smuggle methamphetamine into Guam via balloons placed in his rectal cavity. In addition to that, the authorities had the undercover video, as well as the positive alert for drugs in the Defendant from "Kay." Thus, the strip search was supported by a real suspicion and is therefore constitutional.

---

received notice of the Government's warrant application at or near that time. *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1034 (C.D. Cal. 2015) (courts may take judicial notice of their own records).

[6] The Defendant relies on *United States v. Place*, (in which the Supreme Court determined that a 90-minute detention of baggage violated the Fourth Amendment), but this reliance is misplaced: *Place* concerned a domestic flight from New York to Miami, and thus the officers improperly extended a *Terry*-stop of the defendant's luggage without probable cause. *United States v. Place*, 462 U.S. 696, 709 (1983). As discussed above, searches after a passenger arrives on an international flight are considered border searches, not *Terry*-stops, and only reasonable suspicion is required.

16

### 3. Consent to x-ray and cavity expulsion.

The Defendant consented to the x-ray and cavity expulsion before the warrant was signed and acted upon, and argues that this consent was coerced and violated the Fourth Amendment. A search conducted pursuant to a valid consent is constitutionally permissible, but whether a defendant consented to a search depends on the totality of the circumstances. *Schneckloth v. Bustamante*, 412 U.S. 218, 226 (1973). The government has the burden of proving that the consent was freely and voluntarily given. *Id.* at 223.

The Ninth Circuit looks to five factors in determining voluntariness: 1) whether the defendant was in custody; 2) whether the arresting officers had their guns drawn; 3) whether *Miranda* warnings were given; 4) whether the defendant was notified that [he] had a right not to consent; and 5) whether the defendant had been told a search warrant could be obtained." *United States v. Basher*, 629 F.3d 1161, 1168 (9th Cir. 2011) (internal quotations omitted). It is not necessary for a court to find that all factors are satisfied, "but many of this court's decisions upholding consent as voluntary are supported by at least several factors." *Id.* (internal quotations omitted).

In the present case, the first factor weighs in favor of finding that the Defendant's consent was not voluntary. A person is in custody if a reasonable person in that position would not believe that she or he is free to leave. *Id.* at 1166. When the Defendant consented to the x-ray at the hospital, he had already been *Mirandized*, had been transported to the hospital by agents, and although he was not in handcuffs, it is very doubtful that a reasonable person would believe that the agents would have allowed him to leave.

However, all of the other factors weigh in favor of the court finding that the consent was voluntary. At no time at the A. B. Won Pat International Airport, HSI office, or hospital did the arresting agents and officers draw their guns. *Miranda* warnings were given to the Defendant at

17

the HSI office, which the Defendant originally waived, then invoked around 11:30 a.m., and then waived again at the hospital when he consented to have the x-ray done. The Defendant was told at the hospital that although the attending physician wished him to have the examination done, he had a right not to consent to x-ray until the search warrant was obtained. Knowing this, the Defendant still consented to the x-ray. Further, the Defendant voluntarily stated that he wished to go to the bathroom and expel his body cavities after the x-ray.

Therefore, the court finds that the detention was reasonable, the strip search was satisfied by a real suspicion, and that the consent to x-ray search and body cavity expulsion was not coerced. For these reasons, the court **DENIES** the motion to suppress evidence obtained from the detention, strip search, x-ray, and cavity expulsion of the Defendant, the evidence being four balloons filled with a substance that field-tested presumptive positive for methamphetamine.

### D. The Search and Evidence Obtained From the Defendant's Garage Residence.

The Defendant asserts that because the drug dog sniff, unreasonable detention, and non-routine search of the Defendant all violated the Fourth Amendment, and led to the search of the Defendant's garage residence, the search of the garage residence must be suppressed as fruit of the poisonous tree.

As discussed above, the court finds that the drug dog sniff was reliable, that the detention was reasonable, and that the non-routine searches were constitutional. But further, this argument is irrelevant, because the affidavit used to secure the search warrant for the Defendant's garage residence did not rely on the evidence or events from December 6, 2015. *See* Application, ECF No. 1, MJ Case No. 15-00121. Instead, the affidavit relies on the evidence from the November 13 undercover video, and from an address records check with the Guam Police Department and GCQ. *Id.* While the affidavit mentions that the Defendant confirmed his address during the December 6, 2015 interview with HSI, this information was already known to officers via the

18

records check.

Thus, the court **DENIES** the motion to suppress the search of the Defendant's residence and evidence seized, specifically that evidence being a black pouch containing a silver Browning Arms & Company, 9mm pistol, eight rounds of ammunition, one empty magazine, and drug paraphernalia.

### E.      Search by Law Enforcement of the Defendant's Parents' Home.

The Defendant asserts that the United States exceeded the scope of the search warrant because it was only issued for a search of the Defendant's residence, and did not include the search of the Defendant's parents' home, which yielded the three additional firearms and ammunition. The Defendant asserts this additional evidence from his parents' home must be suppressed for two alternative reasons: 1) the Defendant's consent to search his parents' home was not voluntary; or 2) the Defendant lacked the ability to give permission to search the home.

A person has standing to sue for a violation of the Fourth Amendment only if there has been a violation as to him, personally. *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 695 (9th Cir. 2009). In other words, Fourth Amendment standing, unlike Article III standing, is a matter of substantive Fourth Amendment law; to say that a party lacks Fourth Amendment standing is to say that *his* reasonable expectation of privacy has not been infringed. *Id.* This follows from the Supreme Court's famous observation that the Fourth Amendment "protects people, not places." *Katz v. United States*, 389 U.S. 347, 351 (1967).

Defendants charged with crimes of possession may only claim the benefits of the exclusionary rule if their own Fourth Amendment rights have in fact been violated. *United States v. Salvucci*, 448 U.S. 83, 85 (1980); *see also United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005). To show that the government has violated his Fourth Amendment rights, the Defendant must have a legitimate expectation of privacy in the place searched. *United States v.*

*Gamez-Orduno*, 235 F.3d 453, 458 (9th Cir. 2000). Defendants must demonstrate "a subjective expectation of privacy in the area searched, and their expectation must be one that society would recognize as objectively reasonable." *United States v. Sarkisian*, 197 F.3d 966, 986 (9th Cir. 1999).

The Ninth Circuit has previously applied this rule to a case that is factually similar to the present case. In *Singleton*, ATF agents obtained a search warrant to search a home for cocaine and guns, and when they arrived at the address, they discovered another home behind the home that the search warrant was for. *United States v. Singleton*, 987 F.2d 1444, 1445 (9th Cir. 1993). At the back house, the officers and agents found four people, including the defendant and his father. *Id.* The officers searched the back home and recovered evidence used against the defendant. *Id.* When the defendant filed a motion to suppress, he stated that the police did not obtain valid consent to search, and that the evidence should thus be suppressed as outside the scope of the warrant. *Id.* at 1446. He also argued that even if the court determined that there was consent to search, he did not have authority to consent to the search of the back home because he did not have a sufficient relationship with the back home. *Id.* Despite this, he argued that he had standing to challenge the search. *Id.*

The government contended that the defendant did have authority to consent to the search of the back home, presenting evidence that he lived in the back house and kept his possessions there. *Id.* Despite the evidence presented, the government asserted that the defendant lacked standing to challenge the search. *Id.*

The Ninth Circuit ruled that it is the defendant's burden to establish a privacy right, and if he failed to do so, the motion to suppress must be denied. The court stated:

> The district court should . . . determine[ ] whether the evidence, regardless of the arguments presented by the parties, established that [the defendant] had carried his burden of proving he had a legitimate expectation of privacy. This is an admittedly strange case in that the government did its best to offer evidence that would help [the

20

defendant] meet his burden of proof. . . . [t]he irony, of course, is that whichever side the court believes will lose on this issue.

*Id.* at 1449. Just like *Singleton*, the "irony" in the present case is that the Defendant has convinced the court that he did not have the authority to consent to a search of his parents' home, but in so doing, has offered substantial evidence that he has no legitimate expectation of privacy in their home. The Defendant did not have free access to the home, and possibly not even a key to enter the house. He did not own the house, did not pay rent for the house, and did not live there at the time of the search. He stored items in his old bedroom, but storage alone does not confer a Fourth Amendment interest in the area searched. *See, e.g.*, *Davis*, 932 F.2d at 757–58. Moreover, even if the jury believes that he had a claim to the items seized, mere ownership of the items seized does not entitle its owner to challenge the search of the area in which it was found. *See Salvucci*, 448 U.S. at 92. In light of the totality of circumstances, the Defendant has not met his burden of establishing a legitimate expectation of privacy.[7]

For the foregoing reasons, the court finds that the Defendant does not have standing to object to the search of his parents' home and the evidence seized, because he does not have a legitimate expectation of privacy in the home. The Defendant must demonstrate a subjective expectation of privacy in the area searched, and that his expectation is one that society would recognize as objectively reasonable, which he has not done. Therefore, the court need not address the issue of whether the Defendant's consent was voluntary or not, or whether the Defendant lacked the authority to give permission to search.

Based on the Defendant's lack of standing to object, the court **DENIES** the motion to

---

[7] The Defendant also contends that because Juanito Marquez was present and objected to the search of the Defendant's parents' home, the search was invalid. But the doctrine of standing disallows this argument as well. Even assuming, for argument's sake, that Juanito Marquez is a co-occupant of the home, "a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid *as to him*." *Randolph*, 547 U.S. at 106. If the officers had seized evidence from the home and used it against Juanito Marquez in court, then Juanito Marquez would have standing to object— the Defendant, however, does not.

suppress the firearms, to wit a Llama, 45 caliber pistol; a Ruger, model MK II, 22 caliber pistol;

and a Smith & Wesson .357 revolver, as well as the ammunition, to wit nine rounds of .357

ammunition; sixty-eight rounds of .22 ammunition; seventy-two rounds of 9mm ammunition;

and fifty rounds of .45 ammunition, all found in the Defendant's parents' home.

## IV.     CONCLUSION

Based on the discussion above, the court **DENIES** the Defendant's Motion to Suppress.

The court will issue a separate trial scheduling order.

**SO ORDERED.**



/s/ **Frances M. Tydingco-Gatewood**
  **Chief Judge**
**Dated: Jun 08, 2016**

22